HOSKINS v. ABBOTT.

No. 30525.   June 30, 1942.

*127 P. 2d 815.*

I. L. Cook, of Atoka, for plaintiff in error.

W. M. Rainey, of Atoka, for defendant in error.

GIBSON, J. This action was instituted in district court by Lynn Abbott against Grace Hoskins and others to quiet title to certain lands in Atoka county. Judgment was for the plaintiff, and Grace Hoskins appeals.

Judgment by default was entered against defendants on constructive service. Thereafter the defendant Grace Hoskins appeared in due time and filed her application, with her answer to the petition, seeking to open the judgment and to be permitted to defend, as provided by 12 O. S. 1941 § 176.

The application was granted and trial of the issues had.

Plaintiff's title rested on a county commissioners' deed conveying the county's title acquired under a resale tax deed issued by the county treasurer pursuant to resale of the property for delinquent ad valorem taxes for the year 1933, and subsequent years.

The defense was that the premises were not subject to taxation for the years for which they were sold.

The cause was submitted on a stipulation of facts, which, in substance, was that plaintiff acquired his deed as aforesaid; that defendant was entitled to prevail if the land was not taxable; that said land formerly constituted a portion of the unallotted lands of the Choctaw Nation; that the same was purchased by James W. Ellis from the federal government; that Ellis made final payment of the purchase price on June 13, 1917, received a certificate of purchase from the government and went into possession of the land. The unallotted land deed was issued February 26, 1940, to James W. Ellis. In the meantime, on September 23, 1931, James W. Ellis conveyed the land to defendant Grace Hoskins by warranty deed. It was further agreed that the sole question in the case is whether the lands were taxable before the delivery by the government of the unallotted land deed to Ellis.

We are governed here by the law as expressed in Rose v. Stalcup, County Treas., 78 Okla. 268, 190 P. 396. In that case the plaintiff, in October, 1917, purchased at a sale held under the supervision of the Department of the Interior as provided by law the surface rights of certain of the segregated coal and asphalt lands belonging to the Choctaw and Chickasaw Nations. He paid the full purchase price and received a certificate of purchase which entitled him to the immediate possession thereof. This certificate was issued prior to January 1, 1918, the date as of which lands became assessable for ad valorem taxes for that year, but the deed was not executed until after that date. Under the assumption that the lands were taxable for 1918 the county assessor placed the same on the tax rolls as belonging to plaintiff as of January 1st. The syllabus of that case sufficiently explains the facts. It reads as follows:

"On the 28th day of October, 1917, pursuant to the Acts of Congress approved February 19, 1912 (37 Stat. L. 67), as amended by the Acts of Congress approved August 24, 1912 (37 Stat. L. 518-531), providing for the sale of the surface of the segregated coal and asphalt lands of the Choctaw and Chickasaw Tribes of Indians, under rules and regulations to be prescribed by the Secretary of the Interior, R. was the successful bidder for certain tracts of land offered for sale, under the rules and regulations prescribed. On the date of sale, 25 per cent of the amount of the bid for the respective tracts was paid, and within 15 days thereafter the balance of the 75 per cent was paid and a certificate of purchase was issued by the Superintendent for the Five Civilized Tribes, which certificate entitled the purchaser to the immediate possession of the tracts of land so purchased. Held, that the lands were properly placed upon the assessment rolls for the year 1918 for taxation, notwithstanding the patent was not issued until some time after the first day of January, 1918."

While the court there held that the title of the plaintiff on receiving the certificate of purchase constituted the equitable ownership and the land therefore subject to taxation, it was also remarked that the deed or patent when issued and delivered related back to the date of the original purchase. Subsequent to that decision the Supreme Court of the United States has specifically refused to apply the rule of relation in the matter of taxation of tribal lands, or tribal allotments. McCurdy, County Treas., v. United States, 264 U. S. 484, 44 S. Ct. 345.

The latter case is cited by defendant as authority supporting her contention that the land in this case was held by the United States in trust for the nations aforesaid and that the land was not taxable until the unallotted land deed was issued.

But the case is not in point here. The decision was based on the provisions of the Act of Congress approved June 28, 1906 (34 Stat. L. 539), known as the Osage Allotment Act. Under that act each member of the tribe was entitled to make three selections, and was permitted to designate one as a homestead, which designation was required to be set out in the certificate of allotment and in the deed. The homestead was to remain inalienable and nontaxable until otherwise provided by Congress. The other lands allotted to each member constituted his surplus. The case involved the surplus allotments. The Secretary of the Interior was authorized under certain conditions to issue certificates of competency to adult members of the tribe. The act then specifically provided as follows:

"The surplus lands shall be nontaxable for the period of three years from the approval of this act, except where certificates of competency are issued or in case of the death of the allottee, unless otherwise provided by Congress."

The allottees of the lands in question had all died prior to the issuance of allotment certificates. Succession was governed by the laws of Oklahoma.

The act contained the further provision, as follows:

"All deeds . . . shall be executed by the principal chief for the Osages, but no such deeds shall be valid until approved by the Secretary of the Interior."

The allotments were completed and approved by the Secretary of the Interior November 19, 1908, and deeds to the heirs were signed by the principal chief in May and June, 1909, and approved by the Secretary of the Interior July 30th of that year. None of the parties had received a certificate of competency.

At that time lands were assessable for taxation in this state as of March 1st each year. The question was whether the lands were taxable for the year 1909.

The court said, and held accordingly, that the title to the lands was in the United States on the date as of which the assessment was made, March 1, 1909, and did not pass until the execution and delivery of the deeds (sec. 8); that the lands were not taxable while held in trust by the United States. The decision was based principally on the Enabling Act, and on article 1, § 3, of the State Constitution, wherein it is provided as follows:

"The people inhabiting the state do agree and declare that they forever disclaim all right and title in or to any unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian tribe, or nation; and that until the title to any such public land shall have been extinguished by the United States, the same shall be and remain subject to the jurisdiction, disposal, and control of the United States. Land belonging to citizens of the United States residing without the limits of the state shall never be taxed at a higher rate than the land belonging to residents thereof. No taxes shall be imposed by the state on lands or property belonging to or which may hereafter be purchased by the United States or reserved for its use."

There is a clear distinction between the cited case and the present one.

There the lands in question were not only held in trust for the tribe before allotment but were held in trust ·for individual members after allotment and before the execution of the allotment deeds, all of which was a part of a governmental plan to divide and allot the common lands of the tribe among the members thereof who still remained wards of the government.

Here, at no time did the land become the property of an individual allottee or member of the tribe as such. It belonged to the tribe until sold as provided by law. When Ellis paid the purchase price and received a certificate of purchase the tribe parted with its beneficial interest in the land, the whole of the interest it had ever owned. The government no longer held it in trust for the tribe nor in trust for an allottee thereof as such, but in trust for one who laid no claim to being a ward of the government as an allottee of the tribe.

The circumstances present in the McCurdy Case may well be said to bring the land within the constitutional provision aforesaid whereby the state renounced all claims to tribal lands and recognized the jurisdiction of the United States over the same, and its right to disposal and control thereof. The purpose and intent of the constitutional provision become more apparent when the provision is considered in connection with that portion of section 1 of the Enabling Act (34 Stat. L. 267) which the same was intended to ratify and confirm. The material portion of said act reads as follows:

"Provided, that nothing contained in the said Constitution shall be construed to limit or impair the rights of persons or property pertaining to the Indians of said Territories (so long as such rights shall remain unextinguished) or to limit or affect the authority of the government of the United States to make any law or regulation respecting such Indians, their lands, property or other rights by treaties, agreement, law or otherwise, which it would have been competent to make if this act had never been passed."

The rights pertaining to the Indians and their property, and the government's supervisory control thereof as reserved by the provision last cited, were extinguished by the payment of the purchase price and the issuance of the certificate of purchase. It is of little importance whether the equitable title was vested in the Choctaw Nation with the legal title remaining in the government prior to the issuance of the certificate, or whether both legal and equitable titles were then in the nation. On delivery of the certificate and payment of purchase price the defendant became the owner of the full beneficial interest in the land, and nothing remained for the government and the Choctaw Nation to do except to convey to defendant the legal title as provided by law.

The assessment of the land for ad valorem taxation while nothing but the legal title thereto remained in the government or in the tribe, as the case may be, and after the beneficial interest of the tribe or its members had been extinguished as aforesaid, violated no act of Congress. Therefore, upon the issuance of said certificate of purchase the land became subject to taxation under the laws of this state.

The judgment is affirmed.

WELCH, C. J., CORN, V. C. J., and RILEY, OSBORN, and DAVISON, JJ., concur. BAYLESS, HURST, and ARNOLD, JJ., absent.